number 14-3044. And Mr. Hill. Good morning, almost afternoon. My name is Anthony Hill. I represent the issue in this case, in my mind, the first issue is did Marlon Shannon act as a broker? Was what he did here sufficient to establish the government's case from that perspective? Mr. Hill, there's a button on the bottom of that machine that will raise the... No, not there. Down by your right hand. Now you got to be on your knees to do it. Thanks. Technology. Okay. Look, you learned something new today. How to readjust the whole courtroom. I'll lean in. Let's just start the clock all over again. I don't think I'm going to take all my time. Mr. Hill. Thank you. The first issue in my mind is whether what Marlon Shannon did as the government proved the trial is sufficient to establish that he was a broker for this drug transaction. And essentially, I think the key facts as far as what the government proved that he did is that he had several phone calls with Mr. Blackman, who was the person who supplied and ultimately sold the drugs to the government's confidential informant. So as is noted in my brief, I think it's important for the court to note that those phone calls just involved, at most, a alleged transaction for a nine-piece or nine ounces of cocaine, when in fact the deal that was Mr. Shannon was arrested was for a significantly larger amount of drugs. And there's no evidence whatsoever to suggest, in my mind, that Mr. Shannon was aware of or participated in any way in the actual sale that took place. I think that the sale that took place was in essence, there was a side deal that was just between Mr. Blackman and the confidential source, and Mr. Shannon had nothing to do with that. And I think that that's a problem. Could you address the government's evidence, Mr. Hill, regarding the evidence the defendant bought baking soda for, is it Gangster, is that Mr. Blackman? Gangster is Mr. Blackman. Okay, he bought baking soda for him, and then he actually collected the money from the confidential source, Alan was inspecting it, and took care of driving dirty, and refused to let Al talk to Gangster directly until the day of the deal. Well I think first, let me work backwards, as far as refusing to allow the other two individuals to have a conversation, I think that there was evidence that they actually knew each other outside of Mr. Shannon, which... Knowing each other and trusting each other enough to do a deal is a little different though. And it is, and I recognize that. But I think if you look at what actually happened in the house, Mr. Shannon basically dropped the confidential source off, and then left for four and a half hours. Where, and that's where all the conversations about this extra 63 grams, and all that takes place while Mr. Shannon is out of the house for four and a half hours. And you know the other things that I mentioned obviously in the brief, you know, they're doing nothing but complaining about Mr. Shannon. It doesn't strike me as suggestive that he is involved or necessary to the deal. They're basically complaining, where is he? He's off picking up his friends and going out to have a beer. We want him back here. That suggests to me that he was less involved than what the government wants the court to believe. How about the money? As far as counting the money, there's no dispute that he is seen on camera counting what appears to be hundred dollar bills. There was no evidence at the trial as to where that money came from. There was no conversation where Mr. Blackman asked Mr. Shannon to count the money, or for that matter, whether Al asked Mr. Shannon to count the money. There's just, there was nothing. After he finished counting, what did he tell Blackman and Gangster? He said, here's a stack of ten and a stack of five. Something like, we're good? And there was something along those lines as well. So why isn't that reasonable to assume that he's helping Mr. Blackman and Gangster get this deal? Well, I mean, from my perspective, they could have put the money in a cash counting machine and it would have counted the money. You know, they actually discussed that. Mr. Blackman said something about, you know, the fact that he wanted one but he didn't have one. But without holding it up to the light, right? Well, but you know, it's, the fact that he counts the money doesn't mean necessarily that it was, first of all, I think there's some question as to whether it was the actual buy money that was provided to the confidential source. I also think that the mere fact of counting the money doesn't make him particularly involved because it's a activity that could have been performed by an inanimate object. You know, he did count the money and I'm not hiding from that but I don't think that that's sufficient to support the conviction in this case. As far as, I think the baking soda was the other question that you had, there was a stop on the way from picking up the confidential source and arriving at Mr. Blackman's house at a convenience store like a 7-Eleven type place and there was baking soda that was purchased. He also purchased grapes and some other things. I think there's something somewhere on the tape where he says he purchased the baking soda because he wanted it but again there's no testimony as to what that pronoun, who that refers to. There's no testimony or evidence that the baking soda that he purchased was then at some given to Mr. Blackman when they arrived at his house. You know, the real issue in this case in my mind is the government could have put someone on the stand who was in that house, namely I suppose the confidential source or maybe Mr. Blackman under some circumstances to explain what happened because what you can see on the tape is basically the money counting and then Mr. Shannon leaving for four and a half hours, them complaining about him being gone and then him coming back and driving the source back to his own car. You know, there are major gaps in this case and I think that they're, you know, they're a real question in this case going back to the court's precedence in Bay as to whether it's sufficient. The court said that Bay was a close case and in that I needed the assurance that the source was a reputable source that I could sell to and I wouldn't have done that deal unless the broker, if you will, Mr. Bay, if he hadn't provided that assurance I wouldn't have done the deal. You know, they also, in that case, you know, the drug dealer Mr. Hemphill testified that the money that was given to the broker, to Mr. Bay, was in fact a finder's fee and both of those things are very lacking in this case. There's, you know, there's no doubt I think that Mr. Shannon was given some money. There's a question as to what that was for. If it was for being a broker, if it was to cover gas, if it was to give him some money to buy his wife uniforms, which was discussed, if it was for some other debt because there's discussion of both the wedding and gambling and all kinds of other things between the three of them, there's no explicit discussion on any of the tapes or evidence that was presented by the government that confirms that that's what that was, that that was what that money was for. And, you know, it's the government's burden to answer those questions and in this case, in my mind, if Bay was a close case, this case is the one that falls on the other side of the line because the government could have answered those questions. They could have put a witness on the stand to answer the questions about what actually was going on. Where did that money come from? Was it the buy money? You know, did Mr. Shannon have any knowledge about the drug deal that actually took place, not the drug deal that was discussed on the telephone conversations? The government didn't put anyone on the stand to answer those questions because of that. The other issue that I think bears some, I see my light is just gone, but bears some discussion, but let me just say it very quickly, is the issue as to who was, if Mr. Shannon was in fact acting as a broker, who in fact was he working for? Was he working for Mr. Blackman? Was he working for the government source? I think the fact that the source paid him, that he apparently initiated these phone calls on behalf of the source, suggests that he was in fact, if anything, was an employee of the confidential source, Al, and for that reason I think that's another basis that the conviction should be overturned. And I'll reserve a couple minutes. All right, thank you Mr. Hill. For the government, Mr. Flanagan. May it please the court. My name is Peter Flanagan. I represent the United States. The government presented ample evidence that the defendant knowingly conspired to distribute crack cocaine and that he aided and abetted the distribution of crack cocaine. The evidence showed that the defendant set up this deal. He negotiated the terms of the deal. He abetted the buyer's trustworthiness on behalf of Mr. Blackman, the seller. The defendant controlled access to Mr. Blackman. As Your Honor noted, the defendant also purchased ingredients necessary for cooking the powder cocaine into crack cocaine. As to the statement, and he did so at Blackman's direction, there was the statement that the counsel discussed where he said he wanted or he told me to buy baking soda. There was phone toll records submitted at trial showed plenty of contact between the defendant and Mr. Blackman throughout this day that the deal took place. In addition, there was video showing that Mr. Blackman arrived at the grocery store where the baking soda was purchased by car and when he arrives there's surveillance video that shows the defendant taking a plastic bag that matches a plastic bag. He was observed walking out of the grocery store with and placing it into Mr. Blackman's vehicle, providing an ample basis for the jury to conclude that was the very same baking soda and that the he that they were talking about was the seller, Mr. Blackman. In addition, the defendant counted the buy money and that was again at the seller's direction, at Mr. Blackman's direction. We're being told it might not have been the buy money. I think that there's no basis on for where else the money could have come from. The evidence at trial showed that there were tight controls over the confidential source in this before and after this deal. The source had been given $12,000 in buy money. He was searched for any money or contraband prior to the search. He's observed throughout the day, constant surveillance on him, meeting with both Mr. Blackman and Mr. Shannon, the defendant, and then when he came back he no longer had the $12,000 but he did have just over 300 grams of crack cocaine. In addition, you hear references to Mr. Blackman referring to how much he received in the recordings that were submitted to the jury, saying he got $11,000. In addition, when the defendant received his cut, the confidential source was careful to count out the money one through seven. So altogether, the evidence showed that the money that was being counted was the very same buy money that agents had given the source for purposes of engaging in this transaction. As your honor noted, the defendant was very careful in the way he counted the money, holding bill after bill up to the light making sure that it was real money, that it wasn't counterfeit. It's another example of the defendant looking out for the interests of the seller here, that Mr. Blackman not only told him to count the money but he trusted him to count the money, trusted him to inspect it for counterfeit, something that was very much in the seller's interest. In addition, the suggestion that it was not answered what this money was for, well it's quite clear what it was for. They were there to do a drug deal. There was no discussion of $700 to go out and buy uniforms or $700 to buy some wedding gift. Unlike the Bay case, though, the money came from the buyer? Yes, here the $700, all the money came from the buyer, both the amounts that Mr. Blackman received and the amounts the defendant received. It did come from the seller. I'm not going to suggest that it was for anything other than this drug deal. And in addition, to the extent that the defendant relies on the fact that the $700 came from the buyer to support the idea that at most he was conspiring with the buyer, I think that the bulk of the evidence shows that the defendant was conspiring with the seller. The fact that he was taking directions from the buyer. Mr. Blackman told the defendant, buy baking soda. The defendant bought baking soda. Mr. Blackman told the defendant to make sure you get a count of the money. That's before they even meet. And by the time they actually get to the meeting, Mr. Blackman got the count from the defendant that he wanted. And in addition, the demonstration of trust that's placed in the defendant in getting an accurate count. If the defendant was truly on solely the buyer's side of this transaction, you might expect to see Mr. Blackman count the money for himself to make sure that it's all there. And you might expect Mr. Blackman to inspect the money himself to make sure that it's not counterfeit. In addition, the evidence also, as to the buyer-seller issue, the evidence showed that the defendant and Mr. Blackman had an ongoing relationship. Not only did the defendant know Mr. Blackman well enough to set up this deal, but as we see in the government's brief, these two knew about each other's prior dealings. And in fact, they were so familiar with each other's prior dealings that they were able to speak of them in shorthand. In addition, the defendant protected Mr. Blackman by assuming the risk of transporting both the buyer and the drugs after the deal was done. And these three men explicitly discussed the risks that were involved in that. Mr. Blackman had suggested that he would drive the buyer after all was said and done, but the defendant agreed that he should be the one to drive the buyer and the drugs. Specifically, and they specifically said this, this was to avoid jeopardizing Mr. Blackman. In addition, the defendant was to avoid driving dirty, was that the phrase? Avoid driving dirty, exactly right, because doing so, as was discussed during the ride home, would expose them to, and as the defendant heard well, throughout the day, the constant discussion throughout the day of the need to be cautious and to avoid detection by law enforcement, because they were riding dirty. And then finally, the defendant had negotiated the purchase price, again on behalf of the seller, Mr. Blackman. So time after time, the defendant was acting to protect the interests of the seller, and I submit that the evidence was sufficient to show that the defendant conspired with the seller in this transaction. What about the discrepancy in the amounts of drugs? The deal did originally start off as a nine ounce deal, but the purchase price was set at $9,000 or $1,000 per ounce, and by the time of the deal, another 63 grams was added on. That much is clear, but the original nine ounce quantity that was negotiated always remained part of this deal. First off, you hear in the recordings, Mr. Blackman and the buyer talking about splitting the crack order into a nine ounce piece, or nine ounces, or a nine, and a 63. So it wasn't as if it was all thrown together in a one big, you know, 300 plus gram package. Instead, when it came back to agents from the source, there was one, it was split into two bags, one with nine ounces and one with 63. So the nine ounces that was originally negotiated remained throughout the deal, and I think the jury picked up on that in the way they reached their verdict. While they found that the defendant was guilty of aiding and abetting the distribution of over 280 grams of crack cocaine, they said he was only guilty of conspiring to distribute 28 grams, and I think that they were seizing on the fact that maybe they didn't believe he had sufficient knowledge of the 63 grams prior to the deal being added on. So they only found him guilty for what was probably the nine ounces that he originally negotiated. In any event, I still submit that, and did a trial, that he did have knowledge of that extra 63 grams being tacked on, because he's the one who set the purchase price at $1,000 an ounce, and he's the one who provided the careful count of the money. So every $1,000 of the $11,300 he counted on behalf of Mr. Blackman equaled his knowledge of another ounce of crack cocaine being added to the deal. And when you look at the video, the defendant doesn't register any sort of surprise when he finishes counting the money. Instead, what he says is, everything all good, we're sitting pretty. And there was evidence in the record that the night before the deal took place, the source and the defendant had a conversation. It was an unrecorded conversation, but they refer to it, refer to their conversation the night before the deal in a recording on the day of the deal. And in addition, in the course of that conversation, the defendant says that he had spoken to Blackman and they were all good for the day. And the toll records show the day before the deal, there was a phone call between the defendant and Mr. Blackman. So it's probably at that point, and I address this in a footnote in the government's brief, it's probably at that point that the 63 grams was added to the deal. But again, I don't think that resolving that would decide in this case. In conclusion, the evidence, Your Honors, I submit was more than sufficient to support the jury's guilty verdicts. And unless there are any more questions from me, I respectfully ask that you affirm the defendant's conviction and sentence. Thank you, Mr. Flanagan. Mr. Hill, rebuttal. I'd just like to spend a minute talking a little bit more about the money because I do think that that's key to what was going on here. And I want to make sure the court is clear on the facts. There was $12,000 in buy money that was provided to the confidential source. On video, it's not clear where the money that Mr. Shannon counts comes from, whether it comes from Mr. Blackman, whether it comes from the source, or who it goes to, either way. I also think, and I, you know, I think that it is important to note that after Mr. Shannon counts the money, he says, here goes a stack of five and here goes a stack of 10. I think it's pretty reasonable to conclude that he just counted $15,000. Now, if there was only $12,000 in buy money, I think there's a question as to where the other $3,000 came from, which I think throws the whole money issue into question as to what it was, where it came from, and what it was for. You know, there were many other things that were discussed by these three people before Mr. Shannon left. It was only after Mr. Shannon left that the conversations that the government mentioned about the 63 grams took place. Mr. Shannon is not another time that Mr. Shannon ever had any conversation with anybody about that extra 63 grams. But, you know, I think that there are big questions about the money, and I think there's a real reason to wonder whether the government should have put someone on the stand to explain where the money came from, what it was for, and how much was there, because I don't think that the evidence supports the conclusion that it was just the $12,000 in buy money. There was something else going on there, and we don't know what it was. Thank you, counsel. The case is taken under advisement, and the court will be in recess.